IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHANTEL ADDISON**
**ON BEHALF OF K.S.,**

      Plaintiff,

      v.

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.

Case No. 1:16 CV 2996

Magistrate Judge James R. Knepp, II

MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Chantel Addison ("Addison") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of her daughter, K.S. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Addison filed an application for SSI on behalf of Plaintiff in September 2013, alleging a disability onset date of August 1, 2010. (Tr. 178-82, 186, 190). Her claim was denied initially and upon reconsideration. (Tr. 126-28, 132-35). Addison then requested a hearing before an administrative law judge ("ALJ"). (Tr. 136). On July 23, 2015, Addison and Plaintiff (represented by an attorney) appeared and testified in at a hearing before the ALJ. (Tr. 33-107). On December 28, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-29). The Appeals Council denied Addison's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-6); 20 C.F.R. §§ 416.1455, 416.1481. Addison filed the instant action on behalf of Plaintiff on December 15, 2016. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Education Information

Plaintiff was born in November 2011 (Tr. 178), making her eleven years old as of her disability application, and thirteen years old on the date of her hearing (Tr. 36).

In the 2013-2014 school year (sixth grade), Plaintiff was suspended from her school (Believe to Achieve Academy) on five occasions. (Tr. 220, 222, 226, 231, 234). These suspensions were for tackling another student (Tr. 220); engaging in disruptive behavior and willfully failing to comply with adult direction (Tr. 222); fighting (Tr. 226); refusing to follow directions (Tr. 231); and constant disruption in class (Tr. 234). Plaintiff also had other disciplinary issues during this time period, mostly involving disruptive behavior (verbal and physical). (Tr. 219, 221, 223, 225, 227-30, 235). Plaintiff received grades ranging from A to C in the first quarter, and A to D in the second quarter. (Tr. 238). In the second quarter, she "seldom" demonstrated responsibility and reliability, interacted with others cooperatively, or demonstrated appropriate behavior. (Tr. 238). This was a decrease from the first quarter, in which she was assessed as doing these things "sometimes" or "usually". *Id.* The teacher noted she was "a very smart girl with a lot of potential", but "her behavior is quite concerning". *Id.* She continued: "She should be a straight A student but her attitude and behavior in the class and in the hallways is constantly landing her in trouble. As a result, her grades are dropping due to missing assignments". (Tr. 238-39).

---

1. The undersigned summarizes the portions of the record relevant to the arguments raised by Addison. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

Plaintiff's sixth grade teacher completed an undated Vanderbilt Assessment Scale. (Tr. 213-14). She indicated Plaintiff "often" had difficulty with attention to detail, sustaining attention to tasks, and listening when spoken to directly. (Tr. 213).[2] She also indicated Plaintiff either did not have, or only "occasionally" had other listed symptoms. *See id.* For example, she indicated Plaintiff "never": lost her temper; bullied or threatened others; initiated physical fights; or was physically cruel to others. *Id.* And, Plaintiff "occasionally": did not follow through on instructions, had difficulty organizing tasks and activities; left her seat when remaining seated was expected; and actively defied or refused to comply with an adult's requests. *Id.* She indicated Plaintiff's academic performance was "somewhat of a problem." (Tr. 214). However, Plaintiff also had "average" classroom behavioral performance (including relationship with peers, following directions, disrupting class, completing assignments, and organizational skills). *Id.*

Another sixth grade teacher also completed an undated Vanderbilt Assessment Scale. (Tr. 215-16). In it, she indicated Plaintiff "occasionally" had difficulty with attention to detail, sustaining attention, listening, following instructions, organizing tasks and activities, and fidgeting. (Tr. 215). She was also "occasionally" anxious, self-conscious, afraid to try new things, and felt inferior, guilty, lonely, or sad. (Tr. 215-16). She indicated Plaintiff never had other listed symptoms. *Id.* She indicated Plaintiff's academic performance was "average" in reading, and "somewhat of a problem" in math and writing. (Tr. 216). Like the other teacher, she indicated Plaintiff had average classroom behavioral performance. *Id.*

The record also contains two letters from Plaintiff to her teachers, dated September 2013. (Tr. 232-33). In them, she acknowledged difficulties, as well as efforts her teachers made for her; she thanked her teachers. *Id.*

---

[2] The form did not define the terms "occasionally" or "often" used therein. *See* Tr. 213-14.

Addison completed a disability report for the Social Security Administration sometime after November 2013. (Tr. 197-201). In it, she indicated Plaintiff would "not comb her hair" and "does not match her clothes when she dresses." (Tr. 199). Addison reported she had to "argue with [and] tussle with [Plaintiff] to clean her up [and] do her hair." *Id.*

In February 2014, Addison was asked to withdraw Plaintiff from her school (Believe to Achieve). (Tr. 41, 209). Plaintiff transferred to Alfred A. Benesch School in the middle of sixth grade. (Tr. 41).

At the conclusion of the 2014-2015 school year (seventh grade), the principal of Alfred A. Benesch School wrote a "to whom it may concern" letter. (Tr. 254). In it, she noted Plaintiff: 1) "continue[d] to have problems with other students"; 2) "continue[d] to be disrespectful to teachers and other adults"; and 3) had "79 attendance marks for the 2014-15 school year" including unexcused absences, tardies, and out of school suspensions. *Id.*[3]

Plaintiff attended the "shelter care program" at Carrington Youth Academy from February 12, 2015 through March 11, 2015. (Tr. 253, 256). Case manager / court liaison Pamela Grady noted Plaintiff "struggled with her interactions with her peers" and had "been involved into [sic] several verbal altercations that almost ended into [sic] physical altercations". (Tr. 253). She received several "in house restrictions" for not following directions, but "processed with staff and was able to rejoin the unit with no further issues." *Id.* She also "did manage to turn her behaviors around while in shelter care" and began to "interact[] with her peers in a positive manner, follow staff directives, and all shelter care programming." *Id.*

---

3. Plaintiff's final report card similarly indicated 60 unexcused absences and 22 tardies. (Tr. 260). Neither the letter nor the report card delineate between unexcused absences due to suspension and those due to other reasons. *See* Tr. 260, 254.

Plaintiff returned to Carrington Youth Academy from April 6, 2015 through April 15, 2015. (Tr. 252, 255). She "participated in programming with little redirections from staff", but was "continuously redirected for being off task" and "struggle[d] to follow staff's directives". (Tr. 252). She was disrespectful toward staff, and her "interactions with peers were often negative", including a verbal altercation with a peer on her first day. *Id.* Ms. Grady noted that "[o]verall[,] [Plaintiff] struggled with adjusting to shelter care placement." *Id.*

In December 2015, the Cuyahoga County Court of Common Pleas, Juvenile Court Division declared Plaintiff a delinquent child for knowingly causing or attempting to cause physical harm to her mother. (Tr. 261-62). The court noted Plaintiff was previously adjudicated as a delinquent on May 1, 2015 for domestic violence. (Tr. 261).

<u>Medical Records</u>

In May 2013, Plaintiff (age eleven) was assessed at Applewood Centers. (Tr. 264-72). She was referred "for conduct behavior" and it was reported that she "gets into several fights with her peers and is physically and verbally aggressive toward adults." (Tr. 264). Addison reported Plaintiff had recently been suspended for 10 days after an altercation that "resulted in several children [and] the bus driver getting hurt." *Id.* She also reported Plaintiff shoplifted, stayed out past her curfew, and set a fire in the bathroom out of anger. *Id.* On examination, the evaluator noted Plaintiff's appearance, thought content, speech, intellectual behavior, and behavior were unremarkable. (Tr. 268-69). She had decreased impulse control and frustration tolerance. (Tr. 268). Her mood was angry/hostile, and she expressed infrequent suicidal ideation. (Tr. 269). Plaintiff was diagnosed with a conduct disorder (Tr. 270), and assessed a Global Assessment of Functioning

("GAF") score of 50[4]. (Tr. 270). The evaluator recommended medication, a psychiatric evaluation, and a neurological evaluation. (Tr. 271).

An individual service plan for Plaintiff was established that day. (Tr. 273-75). The rationale for treatment was that Plaintiff "display[ed] aggressive, disrespectful, and disruptive behavior at school and at home" including "verbal and physical conflict", and had "outbursts when angry." (Tr. 273). The treatment goals were: "[e]xpress anger in a controlled, respectful manner on a consistent basis per parent and child report" and "[d]emonstrate marked improvement in impulse control per parent and child report". (Tr. 274-75).

In August 2013, Plaintiff underwent a psychiatric diagnostic interview with Shree Sarathy, M.D. (Tr. 281-84). Addison reported Plaintiff "does not listen at all and always does whatever she wants to do". (Tr. 281). Plaintiff had repeated suspensions, and reports of disruptive behavior. *Id.* Addison reported Plaintiff had set fires, and bit her mother when her mother disciplined her by spanking. *Id.* Plaintiff believed that spanking was abuse, and her mother had been imprisoned after being accused of abuse, but was released after an investigation. *Id.* Plaintiff was in sixth grade at the time of the evaluation, had never failed a grade, and had received passing grades of A, B, and C the prior year. (Tr. 282). On examination, Dr. Sarathy noted impaired grooming and hygiene, as

---

4. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM-IV, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

well as decreased impulse control, decreased frustration tolerance, impaired judgment, and impaired interpersonal boundaries. *Id.* Plaintiff had reduced eye contact, was disinhibited and impulsive, and had impaired concentration. (Tr. 282-83) ("pt was impulsive during appointment, spoke out of turn frequently, was restless"). Her speech was argumentative, and Dr. Sarathy noted possible safety concerns of increased risk-taking behavior, intentional fire starting, and other careless or unsafe behavior. (Tr. 283). Her thought content, intellectual functioning, and perceptions were unremarkable, and she did not evidence suicidal or homicidal ideations. *Id.* Dr. Sarathy assessed conduct disorder, and ADHD, hyperactive type. (Tr. 294). She assigned a GAF score of 45.[5] Dr. Sarathy started Plaintiff on Guanfacine, noting it would help with "her aggressive behavior and her ADHD hyperactive type". *Id.* She also instructed Plaintiff to continue weekly therapy, and noted she would later reevaluate whether a stimulant was needed. *Id.*

In September 2013, Plaintiff followed-up with Dr. Sarathy. (Tr. 278-80). Plaintiff had been taking her medication "for the most part", but her mother felt it was not working. (Tr. 278); *see also* Tr. 279 ("her mother has noted little change in her behavior and hyperactivity"). Plaintiff had been suspended three times since the start of the school year, and continued to physically fight with her mother. *Id.* On examination, Dr. Sarathy checked a box indicating "[n]o significant change from last visit." (Tr. 278). She noted Plaintiff "continue[d] to be very hyperactive and pressured in her speech" and "[h]er violent behavior with other children is also an ongoing problem for her." (Tr. 279). Dr. Sarathy discontinued Guanfacine, and started Plaintiff on Focalin and Intuniv. (Tr. 280).

---

5. As stated above, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

Plaintiff returned to Dr. Sarathy in November 2013. (Tr. 365-67). Dr. Sarathy noted "[t]hough her mother stated last visit that the patient was much improved, she states this visit that her behavior is unchanged." (Tr. 365). Addison reported Plaintiff was not taking her mediations at times, and was more difficult without them. *Id.* Dr. Sarathy also noted: "Vanderbilt forms returned by her school show minimal ADHD symptoms only." *Id.* On examination, Dr. Sarathy checked the "[n]o significant change from last visit" box regarding her mental status examination. *Id.* Plaintiff's appearance was noted to be unremarkable, and although her behavior was disinhibited and hyperactive, Dr. Sarathy noted it was "much improved." *Id.* Dr. Sarathy instructed Plaintiff to continue taking Focalin XR and Intuniv, and to add Focalin in the afternoon. (Tr. 367)

Plaintiff also returned to Applewood Centers for a pharmacological management appointment in November 2013. (Tr. 319-20).[6] The provider stopped the Focalin due to non-coverage by insurance, and started Plaintiff on Concerta. (Tr. 320). The provider also checked a box indicating improvement, noting: "pt's behavior and attitude have improved at school according to teachers but behavior at home is unchanged." *Id.*

In December 2013, Plaintiff returned to Dr. Sarathy. (Tr. 316-17).[7] Dr. Sarathy noted Plaintiff's medications "appear[ed] to be working well" for her. (Tr. 316). She was less hyperactive, but still had "a 'mouth' on her per mother", though she was working on this in therapy. *Id.* Dr. Sarathy again checked a box indicating "[n]o significant change from last visit", but did note impaired grooming and hygiene. *Id.* She again noted Plaintiff was "still hyperactive and disinhibited but much improved." *Id.* Dr. Sarathy again noted improvement at school, but that her mother continued to report "severe symptoms while she is at home." (Tr. 317). In conclusion, Dr.

---

6. This record is duplicated at Tr. 361-62.
7. This record is duplicated at Tr. 357-58.

Sarathy noted Plaintiff was "currently stable and doing well on the combination of Concerta in the morning, immediate acting Focalin in the afternoon, and Intuniv at bedtime." *Id.*

Plaintiff next saw Dr. Sarathy in February 2014. (Tr. 354-56). Addison reported that "for the past couple of weeks", Plaintiff had not been taking her medications. (Tr. 354). Addison reported watching Plaintiff take the medications before that; however, Plaintiff herself stated she had not taken her medication "in months". *Id.* Plaintiff had been suspended from school for five days in January, and upon her return, it was decided that the Assistant Principal would give Plaintiff her morning and afternoon medications. *Id.* Plaintiff continued to be disrespectful, disruptive, and oppositional at school. *Id.* Dr. Sarathy again checked the box noting "[n]o significant change from last visit", and again noted impaired grooming and hygiene. *Id.* Dr. Sarathy noted Plaintiff "was stable and doing well on the combination of Concerta in the morning, immediate acting Focalin in the afternoon, and Intuniv at bedtime until recently, when she stopped taking all of her medications." (Tr. 355); *see also* Tr. 356 (noting deterioration due to failure to take medication). Dr. Sarathy's plan was to return to the same medication regimen, with the school administering medications "to ensure that she takes it." (Tr. 355). Dr. Sarathy noted she would consider a low-dose antipsychotic if Plaintiff did not improve or deteriorated. *Id.*

Addison cancelled an appointment later in February due to car problems. (Tr. 353). Plaintiff then missed four consecutive appointments with Dr. Sarathy between March and May 2014 without explanation. (Tr. 349-52).

In April 2014, Plaintiff went to the emergency room after being involved in an altercation with another child which resulted in her fracturing her right fifth metacarpal. (Tr. 326-43). She reportedly punched another child in the head. (Tr. 331).

In May 2014, Plaintiff returned to Dr. Sarathy. (Tr. 346-48). Addison reported Plaintiff had been kicked out of school one or two months prior, and had been out of medication for the past two months. (Tr. 346). Plaintiff reported getting into frequent fights. *Id.* Dr. Sarathy noted Addison felt Plaintiff "need[ed] something stronger to control her behavior", and started Plaintiff on a low-dose antipsychotic. (Tr. 347). She also "[e]mphasized . . . that following up is crucial", noting Plaintiff had missed the last four appointments. *Id.*

*Medical Opinion Evidenc*e[8]

In November 2013, state agency psychologist Paul Tangeman, Ph.D., reviewed Plaintiff's records. (Tr. 112). He concluded Plaintiff had a marked limitation in the domain of interacting and relating with others. *Id.* He explained:

> [Medical evidence of record] submitted w/ claim indicates clt has had frequent behavior problems. Statements from school staff members, however, indicate that clt has few behavior issues when on meds. Most recent f/u at tx source in 9/13 indicates clt has been mostly compliant w/ meds, but behavior problems w/ suspensions from school continued and mother felt meds were not working.

*Id.* Dr. Tangeman also concluded Plaintiff had a less-than-marked limitation in the domain of caring for oneself, explaining: "Impulsivity and behavior problems may put clt at risk for harm, but she otherwise appears capable of age appropriate self care." *Id.*

In February 2014, state agency psychologist Mary Hill, Ph.D., reviewed Plaintiff's records. (Tr. 121-22). Like Dr. Tangeman, she concluded Plaintiff had a marked limitation in the domain of interacting and relating with others, and a less than marked limitation in the domain of caring for oneself. *Id.* Regarding interacting and relating with others, Dr. Hill explained:

> [Medical evidence of record] submitted w/ claim indicates clt has had frequent behavior problems. Statements from school staff members, however, indicate that

---

8. Because Plaintiff only challenges the ALJ's determinations regarding the domains of interacting and relating with others and caring for self, the undersigned only summarizes the medical opinion evidence on these points.

clt has few behavior issues when on meds. On recon, mother indicated clmt's behavior worsened as of 11/2013; however, 12/13/13 OV notes state that the new combination of meds "appears to be working well for" clmt. She is less hyperactive. Still mouthy w/ mother. School is going well and she has only gotten in trouble 2x recently. Better at managing impulsivity and anger.

*Id.* With regard to caring for oneself, Dr. Hill noted: "Impulsivity and anger management have improved. Hygiene/grooming age appropriate." (Tr. 122).

In June 2014, Dr. Sarathy completed a questionnaire regarding medical and functional equivalence. (Tr. 379-82). Dr. Sarathy noted she had known Plaintiff for approximately one year. (Tr. 379). She checked boxes indicating, *inter alia*, that Plaintiff had "extreme" limitations in interacting and relating with others and caring for self. (Tr. 380-81). The form defined "extreme" as "[n]o meaningful function in a given area. Testing is usually three standard deviations below the norm." (Tr. 379). Dr. Sarathy explained Plaintiff "ha[d] been kicked out of school before [and] suspended numerous times for getting into frequent physical altercations" and that she "would benefit from in-home therapy." (Tr. 381). She further explained:

[Plaintiff] has a conduct disorder as well as ADHD. Neither is episodic. ADHD can improve on meds but conduct disorder will likely not improve with meds. She needs therapy for the conduct disorder. Her conduct disorder is related to her frequently physical fights [and] lack of remorse for hurting others.

* * *

[Plaintiff] needs an extremely structured [and] strict environment in order to do well. If allowed too much freedom to do what she desires, she will likely continue with her dangerous [and] violent behavior.

(Tr. 381-82).

Hearing Testimony

Both Plaintiff and Addison testified at the July 2015 hearing before the ALJ. *See* Tr. 33-107.

Plaintiff testified she was thirteen years old and about to enter the eighth grade. (Tr. 36). She had attended Believe to Achieve Academy in fifth and sixth grade, but was kicked out part way through sixth grade. (Tr. 40-41, 63). She finished sixth grade, and attended seventh grade at Albert Benesch. (Tr. 42). Plaintiff had passed seventh grade, but missed part of the year because she was in jail due to a domestic violence charge arising out of a physical fight with her mother and brother. (Tr. 44-47). Addison testified Plaintiff had been sent to the Carrington group home. (Tr. 49). Plaintiff was serving a probationary sentence. *See* Tr. 38-50.

Plaintiff, her mother, and brother had participated in family counseling in 2012. (Tr. 52-53). Plaintiff had received treatment at Applewood, but had stopped the prior summer. (Tr. 54). Addison stated Plaintiff "got kicked out of the behavior program they had her going to five days a week. They kicked her out because of her behavior." *Id.* Plaintiff testified she got kicked out "because the boy spit on me and I beat him up." *Id.*

Addison testified Plaintiff had not been on any medication since she left Applewood the prior summer. (Tr. 55). Addison was trying to get Plaintiff treatment elsewhere to get her back on medication. *Id.* She stated Plaintiff stopped going to Applewood because the medication was not working. (Tr. 56). However, she further explained:

> So, this last medication that she was on, I'm not going to say I don't think it wasn't [sic] working. I'm not going to say that, but what it was is that she wasn't taking it like she was supposed to for it to do that job. She wasn't taking the mediation.

(Tr. 57). She tried to ensure Plaintiff took the medication by watching her to make sure she swallowed it, but Plaintiff would trick her. *Id.* Addison testified she could tell Plaintiff was not taking her medication "because of the behavior." *Id.* She also testified that even without the medication: "You know, but she was kind of cool. She was kind of - - she did kind of good, you know, the rest of that school year. So I just said I'll wait until the next school year . . ." *Id.*

Plaintiff testified that she stopped taking medication because "If the pills don't - - the bottles - - the pills is not in the bottle and it don't have no name on it. I'm not about to take nothing I don't know what it is." (Tr. 95). She also stated her mother told people "she ain't been giving me the medication because she feel like I don't need it and she not about to medicate her daughter." (Tr. 96).

Addison testified that Plaintiff's daily routine was "to get up, take a shower, get dressed." (Tr. 65).When asked what she liked to do, Plaintiff testified she liked to babysit. (Tr. 62). Plaintiff liked school sometimes, but did not want to be there all day. (Tr. 64). Later, Plaintiff indicated she intended to go to college and wanted to become a lawyer. *See* Tr. 72-73.

The day before the hearing, Plaintiff was in a physical fight at her cousin's house. (Tr. 65-68). And, Addison testified Plaintiff had recently taken a taser (belonging to her mother) to school, which resulted in a suspension. (Tr. 76-77). When asked what she had learned from this, Plaintiff responded: "I won't take another taser to school. I mean I'll hide it. Like I just won't take nothing to school." (Tr. 77). Plaintiff testified she gets in fights because people "don't like [her]" and she was "not going to bite [her] tongue for nobody." (Tr. 78).

Throughout the hearing, Addison and Plaintiff argued. *See generally* Tr. 42-107; Tr. 18.

ALJ Decision

In her written decision, the ALJ found Plaintiff was born in November 2001, making her a school age child on the date of her application, and an adolescent at the time of the decision. (Tr. 16). Plaintiff had not engaged in substantial gainful activity since her application date. *Id.* The ALJ found Plaintiff had severe impairments of conduct disorder and attention deficit hyperactivity disorder, but that these impairments—either singly or in combination—did not meet or equal the severity of a listed impairment. *Id.* The ALJ further found Plaintiff did not have an impairment or

combination of impairment that functionally equaled the severity of the listings. (Tr. 17). In so deciding, the ALJ explained Plaintiff had: 1) no limitation in acquiring and using information; 2) less than marked limitation in attending and completing tasks; 3) marked limitation in interacting and relating with others; 4) no limitation in moving about and manipulating objects; 5) less than marked limitation in caring for herself; and 6) no limitation in health and physical well-being. (Tr. 22-28). Thus, the ALJ concluded, Plaintiff was not disabled from her application date to the date of the decision. (Tr. 28-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are:

1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

**DISCUSSION**

As described above, the Commissioner must find functional equivalence if the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(a). The ALJ here found Plaintiff had marked limitation in interacting and relating with others, but less than marked limitation in the other domains. Addison presents two arguments, either of which individually would result in a finding of functional equivalence: 1) the ALJ should have found an extreme limitation in the domain of interacting and relating with others; and 2) the ALJ should have found a marked limitation in the domain of caring for self. Within these arguments, Plaintiff argues the ALJ did not properly analyze the opinion of her treating psychiatrist, Dr. Sarathy. The Commissioner responds that the ALJ did not err, and her decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned affirms the Commissioner's decision.

Functionality Domains

*Interacting and Relating With Others*

Addison first argues the ALJ should have found Plaintiff to have extreme, rather than marked, limitation in interacting and related with others. In conjunction, she contends the ALJ improperly discounted the opinion of treating psychiatrist Dr. Sarathy. The Commissioner responds that the ALJ's determination regarding this domain is supported by substantial evidence, as is the decision to discount Dr. Sarathy's opinion.

The domain of interacting and relating with others considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations define the expectations in this domain for school-age children (age 6-12) as follows:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv); *see also* SSR 09-5p, 2009 WL 396026, at *6.

Examples of limited functioning in this domain (although such examples do not necessarily indicate a marked or extreme limitation) include: 1) not reaching out to be picked up and held; 2) having no close friends, or friends are all older or younger; 3) avoiding or withdrawing from people the child knows, or the child is overly anxious or fearful of meeting new people or trying new things; 4) having difficulty with playing games or sports with rules; 5) having difficulty communicating with others; and 6) having difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926(a)(i)(2)(i)-(vi); *see also* SSR 09-5p, 2009 WL 396026, at *6-7.

The ALJ here explained her finding of marked limitation in this domain:

> While the claimant has been involved in verbal and physical altercations, at times she is responsive to redirection from others. In fact, the record reflects the claimant was responsive to her teachers who praised her and encouraged her. She was able to be redirected while attending Carrington and was noted to develop good relationships with others including peers. Despite these praises, the claimant is noted to be disrespectful to adults at times. She has been involved in physical altercations with other students, which has resulted in her being suspended. Additionally she was recently arrested due to a domestic violence incident where she physically assaulted her mother. The claimant does have friends her age and is able to participate in social activities. She is able to effectively communicate with others and express her ideas. She expressed an understanding of long-term goals.

> While she has been able to resolve conflicts, she often resorts to verbal and physical altercations [citing Tr. 209-40, 252-53]. The claimant is able to attend school and maintain relationships. She has marked limitations in interacting and relating with others.

(Tr. 25-26).

The undersigned finds the ALJ's assessment of a marked limitation in this domain supported by substantial evidence. First, although Plaintiff argues the ALJ misinterpreted the evidence from Carrington Youth Academy, the record supports the ALJ's finding. Ms. Grady noted that although Plaintiff initially "struggled in her interactions with her peers", and had been involved in altercations, she also "processed with staff and was able to rejoin the unit with no further issues" and, at the time of the letter "interact[ed] with her peers in a positive manner, follow[ed] staff directives and all shelter care programming." (Tr. 253); *see also* Tr. 19 (ALJ's discussion of Ms. Grady's letters). A record from Plaintiff's later stay at Carrington noted Plaintiff "participated in programming with little redirections from staff" but had trouble following directions, and had negative interactions with peers. (Tr. 252).

The ALJ also noted Plaintiff was "able to effectively communicate with others and express her ideas." (Tr. 25). This was consistent with the ALJ's earlier notation that Plaintiff "was articulate and appropriate during the hearing" and "answered all questions appropriately and did not become disruptive or confrontational during the hearing." (Tr. 20). Additionally, the ALJ's explanation that Plaintiff "was responsive to her teachers who praised her and encouraged her" is supported by the letters in the record Plaintiff wrote to two teachers. *See* Tr. 232-33. Additionally, both sixth grade teachers indicated Plaintiff had "average" classroom behavioral performance (which included relationships with peers, following directions, and disrupting class, among other things). *See* Tr. 21 (citing Tr. 214, 216). These records also lend support to the ALJ's conclusion that Plaintiff "is able to attend school and maintain relationships." (Tr. 26).

Further, this is not a case where the ALJ ignored negative evidence. Rather, she specifically noted Plaintiff's problems with being disrespectful, verbal and physical altercations resulting from conflict, and arrest for domestic violence. *See* Tr. 25. For these reasons, the ALJ found Plaintiff had *marked* limitation in this domain. Additionally, the ALJ's decision is supported by the state agency reviewing psychologist Dr. Tangeman's opinion (Tr. 112), to whom the ALJ ascribed "great weight" regarding this domain. (Tr. 22).

Within her argument that Plaintiff was more limited in this domain, Addison argues the ALJ erred in not adopting treating psychiatrist Dr. Sarathy's opinion that Plaintiff had "extreme" limitation in interacting and relating with others. The ALJ explained she gave Dr. Sarathy's opinion "partial weight" overall. (Tr. 20). And, she explained the definition for "extreme limitation" on the form Dr. Sarathy completed was "no meaningful function in a given area with testing using three standard deviations below the norm." *Id.* (citing Tr. 379). She also explicitly addressed this finding by Dr. Sarathy:

> As for an extreme limitation in interacting and relating with others, I find the record does not support this finding. While the claimant has been noted to engage in physical and verbal altercations, she has maintained enrollment in school. She has been suspended on occasion, but she is able to participate in a normal classroom, maintain friendships and interact with others in an appropriate manner, when not angered. In fact the claimant showed restraint in her letter to her teachers, indicating the claimant is able to comply with rules and criticism at times. [citing Tr. 209-32] Not only do Dr. Sarathy's objective findings fail to support this but also the overall record does not support an extreme litigation in this area.

(Tr. 20).

For the reasons stated above, there was substantial evidence in the record with which to partially discount Dr. Sarathy's opinion, and to conclude Plaintiff's limitations in this domain were marked, but less than extreme. The ALJ explicitly noted that "Dr. Sarathy's objective findings" failed to support her conclusion of an extreme limitation. (Tr. 20). And this is supported by the

record. *See* Tr. 278 (Plaintiff's report to Dr. Sarathy that she "is not having any problems at school and is making good grades" although she also "admit[ted] to talking back to her teacher."); Tr. 316 (Plaintiff's report to Dr. Sarathy that "[s]chool is going well" and Dr. Sarathy's report that medications "appear[ed] to be working well"); Tr. 365 (Dr. Sarathy's notes of "improved control and tolerance today" as well as behavior that was "still hyperactive and disinhibited but much improved."); Tr. 359 ("pt's behavior and hyperactivity has improved" on medication); Tr. 367 ("pt's behavior and attitude have improved at school according to teachers but behavior at home is unchanged.");

Plaintiff also objects to the ALJ's statement that Dr. Sarathy had not evaluated Plaintiff since May 2014. (Doc. 17, at 13). Specifically, she contends that Dr. Sarathy saw Plaintiff in May 2014, and issued her opinion in June 2014, and "[a] month cannot be identified as a lapse in treatment or knowledge of the patient sufficient for the ALJ to discredit the opinion." The undersigned finds the ALJ's reasoning, taken as a whole, however, is supported. The ALJ stated, at the beginning of her explanation for giving Dr. Sarathy's opinion "partial weight":

> While Dr. Sarathy treated the claimant at Applewood Centers for conduct disorder and attention deficit hyperactivity disorder, she has not evaluated the claimant since May 2014. Additionally, her opinions were based on the claimant not taking medication or participating in therapy as recommended by Dr. Sarathy.

(Tr. 20). The record reflects that Plaintiff saw Dr. Sarathy in February 2014 (Tr. 354-46), cancelled one appointment (Tr. 353), and missed four consecutive appointments between March and May 2014 without explanation (Tr. 349-52). The next time Dr. Sarathy saw Plaintiff, in May 2014, Addison reported Plaintiff had been out of her medication for two months. (Tr. 346). Dr. Sarathy completed her opinion in June 2014 without any further treatment notes from Plaintiff. Thus, the ALJ's conclusion that her statements were based on claimant's level of functioning without medication or therapy, and notation that Dr. Sarathy had not evaluated Plaintiff since May 2014

(at which time she had been off medication for two months), are supported by the record, and are proper considerations. *See* Tr. 381 (noting Plaintiff's "ADHD can improve on meds but conduct disorder will likely not improve with meds. She needs therapy for the conduct disorder."); *see* also Tr. 280 ("[c]ontinue with weekly therapy"); Tr. 367 (same); Tr. 318 (same); Tr. 321 (same); Tr. 356 (same); Tr. 54 (testimony that Plaintiff had not been to counseling since the prior summer). The ALJ did not, therefore, improperly rely on an incorrect lapse in treatment to discredit Dr. Sarathy's opinion. And, as noted above, the ALJ gave additional, specific reasons for discounting that opinion as it relates to this domain.

The ALJ's evaluation of Dr. Sarathy's opinion, combined with the records cited by the ALJ and discussed above, provide substantial evidence to support the ALJ's determination in this domain. Thus, the undersigned finds the ALJ's conclusion that Plaintiff had a marked restriction in this domain supported by substantial evidence.

*Caring for Self*

Addison next argues the ALJ should have found Plaintiff had marked, rather than less than marked, limitation in the domain of caring for self. Again, she contends a marked limitation in this domain was supported by Dr. Sarathy's opinion, which she alleges the ALJ improperly discounted. Commissioner responds that the ALJ's determination regarding this domain is supported by substantial evidence, as is the decision to discount Dr. Sarathy's opinion.

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding school-aged children:

You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv); SSR 09-7p, 2009 WL 396029, *5.

Examples of limited function in caring for yourself (although such examples do not necessarily show marked or extreme limitation) include: 1) putting inedible objects in the mouth; 2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-chewing food) or have stereotyped mannerisms (e.g., body rocking, headbanging); 3) not dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi); *see also* SSR 09-7p, 2009 WL 396029, at *6.

The ALJ explained her finding of less than marked limitation in this domain:

Occasionally the claimant has been observed to have poor hygiene and grooming [citing Tr. 263-84]. However, this has not been observed on a going [sic] and continuous basis and is not observed by administrators. She does become aggressive and defensive with others, however this has improved [citing Tr.197-201, 344-78]. She demonstrates increased independence and is able to perform activities of daily living independently. The claimant recognized that she is willing to take medication, however, she reports the medication in the household is not correctly labeled and she does not feel safe taking it. She has less than marked limitation in her ability to care for herself.

(Tr. 28).

The ALJ's finding of a less than marked limitation in this domain is supported by substantial evidence. Contrary to Plaintiff's argument that the ALJ "did not provide specific

reasoning why she determined this domain to be less than marked", (Doc. 17, at 13), the ALJ did

in fact explain (Tr. 25).[9] First, the ALJ explained that while there have been notations in the record

regarding poor hygiene, these were not observed on an ongoing basis. (Tr. 28). This was an

accurate description of the record. *Compare* Tr. 268, 294 (appearance unremarkable) *with* Tr. 278,

282, 316, 364 (impaired grooming and hygiene). And, as the ALJ noted, Plaintiff was

demonstrating independence and was able to perform activities of daily living. (Tr. 28); *see* Tr. 65

(Addison's testimony that Plaintiff's morning routine was getting up, taking a shower, and getting

dressed).This is relevant to the domain of caring for oneself because it "involves the emotional

ability to engage in self-care activities, such as feeding, dressing, toileting, and maintaining

hygiene and physical health." SSR 09-7p, 2009 WL 396029, at *3; *see also id.* at *2 (domain

includes how well a child "take[s] care of their own health, possessions, and living area").

Additionally, the ALJ relied on Plaintiff's testimony that she was willing to take

medication, but did not want to take unlabeled medication. (Tr. 28); *see* Tr. 95 ("If the pill don't -

- the bottles – the pills is not in the bottle and it don't have no name on it. I'm not about to take

nothing I don't know what it does."). Although her testimony was not entirely clear, Plaintiff also

testified that her mother stopped her from taking her medication. *See* Tr. 95-96 ("She said that she

talk to people, She said she ain't been giving me the medication because she feel like I didn't need

it and she not about to medicate her daughter."). Again, willingness to take prescribed medication

is a valid consideration regarding this domain. *See* SSR 09-7p, 2009 WL 396029, at *6 (listing

---

9. The case cited by Plaintiff, *Popp v. Comm'r of Soc. Sec. Admin.*, 2014 WL 1513844, at *1 (N.D. Ohio), for the proposition that the lack of meaningful analysis at Step Three is reversible error is distinguishable for this reason.

"[t]akes medications as prescribed" as age-appropriate caring for self behavior for adolescents and "refusal to take medication" as an example of a limitation in this domain).[10]

As with the prior domain, Plaintiff again objects to the ALJ's treatment of Dr. Sarathy's opinion regarding this domain. Again, the ALJ explained she gave Dr. Sarathy's opinion "partial weight" overall and explained the definition for "extreme limitation" on the form Dr. Sarathy completed was "no meaningful function in a given area with testing using three standard deviations below the norm." (Tr. 20) (citing Tr. 379). She explicitly addressed Dr. Sarathy's opinion that Plaintiff had an extreme limitation in caring for self (in conjunction with her analysis of interacting and relating with others):

> The record clearly does not support this finding. While the claimant is noted to become physically agitated and engaging in verbal confrontations at times, she is able to effectively express her emotions and needs. She does not always appropriately handle her frustration but she is able to care for herself including grooming, taking care of her possessions and coping with the frequently changing school environment. Dr. Sarathy does not provide the objective evidence that supports her assessment that the claimant has extreme limitations in her ability to care for herself. As noted she is able to attend school, socialize, take care of her personal needs and interact with others. These reports do not support an extreme limitation in interacting and relating with others or caring for self. Additionally these did not reflect the claimant's ability when maintained on medication and enrolled in therapy.

(Tr. 20-21).

As with the above domain, the ALJ provided good reasons, supported by the record, for the weight assigned to Dr. Sarathy's opinion. An ALJ may discount a treating physician's opinion, where, as the ALJ found, the physician "does not provide the objective evidence that supports her assessment." *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant

---

10. There is certainly contradictory evidence in the record on this point. *See, e.g.*, Tr. 354-56. However it is an ALJ's duty—not this Court's—to resolve such conflicts in the record. *See, e.g., Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

evidence to support a medical opinion . . . the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("Conclusory statements from physicians are properly discounted by ALJs."). And, the ALJ here again noted that Dr. Sarathy's opinion "did not reflect the claimant's ability when maintained on medication and enrolled in therapy." (Tr. 21). As discussed above, this is supported by the longitudinal treatment records of Dr. Sarathy which show that in May 2014—the last visit before Dr. Sarathy's opinion—Plaintiff had not taken medication for two months. *See* Tr. 346.

Plaintiff objects that the ALJ did not explicitly address Dr. Sarathy's statement that Plaintiff needed "an extremely structured and strict environment in order to do well. If allowed too much freedom to do what she desires, she will likely continue with her dangerous [and] violent behavior." *See* Doc. 17, at 14 (quoting Tr. 382). An ALJ is not required to discuss verbatim every piece of evidence in the record. And, her decision as a whole reflects that she thoroughly considered Dr. Sarathy's opinion and explained her reasons for discounting it. *See* Tr. 20-21.

Further, the ALJ's decision on this domain is supported by the state agency physicians' opinions, to which the ALJ ascribed "great weight." *See* Tr. 112, 122.

The undersigned also notes that some of the evidence Plaintiff points to involves behaviors primarily directed at others. *See* Doc. 17, at 14 (citing "repeated suspensions for fighting, as well as fourth degree felony charges for domestic violence against her family"). The relevant Social Security rulings distinguish between whether a behavior should be considered in relation to caring for self, or interacting and relating with others. *See* SSR 09-5p, 2009 WL 396026, at *4.[11] "A

---

11. This same section, entitled "The Difference Between the Domains of 'Interacting and Relating with Others' and 'Caring for Yourself'" is duplicated in SSR 09-7p, 2009 WL 396029, at *4.

decision about which domain is appropriate of the evaluation of a specific limitation depends on the impact of the particular behavior." *Id.* Here, many of the behaviors Plaintiff points to are primarily directed at others, rather than herself. As stated in the ruling, the domain of "caring for yourself" does not "concern the ability to relate to other people." *Id.* One example provided distinguishes between the two domains:

> If a girl with hyperactivity impulsively runs into the street, endangering herself, we evaluate this problem in self-care in the domain of "Caring for yourself." On the other hand, if she interrupts conversations inappropriately, we evaluate this problem in social functioning in the domain of "Interacting and relating with others."

*Id.* Based on this explanation, the undersigned cannot conclude that the ALJ erred in not finding the cited behaviors as indicated a greater restriction in the domain of caring for self. *See Hawthorne v. Colvin,* 2014 WL 2920811, *5-6 (N.D. Ohio) (adopting report and recommendation stating an ALJ did not err in evaluating a minor claimant's "aggression, bullying, fighting, and disrespectful behavior" under the domain of interacting and relating with others instead of caring for oneself"). The *Hawthorne* court also noted that if aggression and disrespectful behavior were evaluated under both interacting and relating with others and caring for self, "a finding of marked impairment in the area of interacting and relating with others would necessarily trigger a finding of marked limitations in the area of caring for oneself, thereby undermining the regulatory scheme" where two marked limitations equals disability. *Id.* at *6.

The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Again, substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. Given the evidence discussed above, the undersigned concludes the ALJ

did not err in her evaluation of this domain, and her decision falls with the "zone of choice" allowed by the substantial evidence standard.

Notably, with regard to both of the above-discussed domains, ALJ did not find Plaintiff had *no* limitation—she discussed and acknowledged difficulties in each. Rather, she found Plaintiff's limitations were less than marked in caring for self, and marked in interacting and relating with others. Although Addison can point to evidence to support a contrary conclusion, the Court may not overturn "if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does here, so the undersigned affirms.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI supported by substantial evidence. Accordingly the decision of the Commissioner is affirmed.

IT IS SO ORDERED

       s/James R. Knepp II
       United States Magistrate Judge